UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEWART TITLE GUARANTY COMPANY,<br>    Plaintiff,<br><br>v.<br><br>UBS PRINCIPAL FINANCE LLC,<br>I-PARK GROVE WILLOW LLC,<br>I-PARK WEST SEYON LLC, and<br>CHICAGO TITLE INSURANCE COMPANY<br>    Defendants | DOCKET NO. 04-10783-GAO |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

I. <u>Introduction</u>

This is an action for declaratory judgment to determine the rights and responsibilities of the parties under two policies of title insurance (the Policies) issued by the Plaintiff, Stewart Title Guaranty Company ("Stewart") and Defendant Chicago Title Insurance Company ("Chicago") as co-insurers, in favor of the Defendant UBS Principal Finance LLC ("UBS"). After UBS made claims under the Policies, Stewart conducted an investigation and determined the possible loss compensable under the Policies. Stewart tendered payment of the potential loss to affiliates of UBS, which UBS and its affiliates accepted while reserving their rights. Stewart now seeks a judgment of this Court determining the rights and obligations of the parties under the Policies, determining the loss or damage to UBS, if any, determining the extent to which UBS already has been compensated for any loss under the Policies, and declaring that Stewart has fulfilled all of its obligations under the Policies. Stewart also seeks a declaration as to the rights and liabilities if any between itself and Chicago.

## II. The Parties

1. The Plaintiff, Stewart Title Guaranty Company, is a Texas corporation with a principal place of business in Houston, Texas.

2. The Defendant, UBS Principal Finance LLC, is a Delaware limited liability company with a principal place of business in New York, New York.

3. I-Park Grove Willow LLC ("I-Park Grove Willow"), is a Delaware limited liability company with a principal place of business in New York, New York.

4. I-Park West Seyon LLC ("I-Park West Seyon"), is a Delaware limited liability company with a principal place of business in New York, New York.

5. Upon information and belief I-Park Grove Willow and I-Park West Seyon are subsidiaries of and/or entities under the direct control of UBS. Unless otherwise noted, I-Park Grove Willow, I-Park West Seyon, and UBS shall be referred to in this complaint collectively as "UBS."

6. Chicago Title Insurance Company ("Chicago") is a Missouri corporation with a principal place of business in Chicago, Illinois.

## III. Jurisdiction

7. This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332.

8. Venue in the District of Massachusetts is proper pursuant to 28 U.S.C. §1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts and the property that is the subject of the action is situated in Waltham and Watertown, Massachusetts.

## IV. Facts

### A. The Underlying Loans and Title Insurance Policies

9. On or about December 1, 2000, UBS made a loan of $88,500,000 to Grove Willow LLC ("Grove Willow"), which was secured by a Mortgage, Security Agreement, Assignment of Leases and Fixture Filing (the "Grove Willow Mortgage") on property located at 47 Foundry Street, 190 Willow Street, 20 & 28 Seyon Street and 36 River Street, Waltham & Watertown, Massachusetts (the "Property"), which is the site of a former Raytheon plant. A copy of the Grove Willow Mortgage is attached to this complaint as Exhibit "A."

10. Grove Willow had purchased the Property from Raytheon by a deed dated December 28, 1999. Upon information and belief, the loan by UBS was intended to finance Grove Willow's conversion of the former Raytheon plant to a telecommunications facility.

11. On or about December 19, 2000, Stewart and Chicago as co-insurers, issued a policy of title insurance in favor of UBS, policy number 2051-25376 (the "First Policy"). A copy of the First Policy is attached to this complaint as Exhibit "B."

12. On or about February 28, 2001, Grove Willow sold a portion of the Property to West Seyon LLC. That conveyance was part of a loan restructuring in which West Seyon assumed a portion of the Grove Willow debt ($33,500,000) and granted as security a Split Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Fixture Filing (the "West Seyon Mortgage") to secure the assumed debt. A copy of the West Seyon Mortgage is attached to this complaint as Exhibit "C."

13. Also on or about February 28, 2001, Grove Willow executed an Amended and Restated Mortgage, Security Agreement, Assignment of Leases and Fixture Filing (the

"Amended Mortgage") in favor of UBS. A copy of the Amended Mortgage is attached to this complaint as Exhibit "D."

14. On or about March 2, 2001, Stewart and Chicago as co-insurers, issued a second policy of title insurance in favor of UBS, policy number 2151-25005 (the "Second Policy" and collectively with the First Policy as the "Policies"). A copy of the Second Policy is attached to this complaint as Exhibit "E."

15. The First Policy contained a "Land Same as Survey Endorsement," under which Stewart and Chicago assured "that the said land is the same as that delineated on the plat of a survey made by BSC Group designated Job No. 4-5767.00 dated August 9, 1999, revised October 18, 1999, December 26, 1999, December 28, 1999 and updated November 6, 2000" (the "1999 BSC Plan"), insuring "against loss which said Insured shall sustain in the event said assurances herein shall prove to be incorrect." A copy of the 1999 BSC Plan is attached to this complaint as Exhibit "F."

16. The Second Policy contained a "Land Same as Survey Endorsement," under which Stewart and Chicago assured "that the said land is the same as that delineated on [a] survey . . . entitled Plan of Land in Waltham/Watertown Massachusetts (Middlesex County) West of Seyon Street dated January 25, 2001, revised February 5, 2001 by BSC Group Scale 1" = 50' and Survey entitled Plan of Land in Waltham/Watertown Massachusetts (Middlesex County) East of Seyon Street" dated January 25, 2001 by BSC Group Scale 1" = 50'" (the "2001 BSC Plan"), insuring "against loss which said Insured shall sustain in the event said assurances herein shall prove to be incorrect." A copy of the 2001 BSC Plan is attached to this complaint as Exhibit "G."

17.  Each of the Policies contains a "Coinsurance Endorsement," under which each insurer agreed to be "jointly and severally liable with the [each other] for the first $1,000,000 of any loss or damage compensable under the policy, including costs, attorneys' fees and expenses which the company is obligated to pay under this policy."

### B. The Foreclosures

18.  The records of the Middlesex County Southern District Registry of Deeds and the Middlesex County Registry District of the Land Court (the "Registry of Deeds") reveal that UBS executed an Assignment of Mortgage assigning the Grove Willow Mortgage as amended by the Amended Mortgage to I-Park Grove Willow. A copy of that assignment is attached to this complaint as Exhibit "H."

19.  The records of the Registry of Deeds also reveal that UBS executed an assignment of the West Seyon Mortgage to I-Park West Seyon. A copy of that assignment is attached, along with the I-Park Grove Willow assignment, to this complaint as Exhibit "H."

20.  I-Park Grove Willow foreclosed its mortgage, presumably as a result of the default of Grove Willow, and conveyed the property covered by its mortgage to itself through a foreclosure deed dated February 10, 2003, for stated consideration of $20,000,000. A copy of the foreclosure deed to I-Park Grove Willow is attached to this complaint as Exhibit "I."

21.  I-Park West Seyon foreclosed its mortgage, presumably as a result of the default of West Seyon, and conveyed the property covered by its mortgage to itself through a foreclosure deed dated February 10, 2003, for stated consideration of $30,000,000. A copy of the foreclosure deed to I-Park Grove Willow is attached to this complaint as Exhibit "J."

### C. UBS's Claims

22. By two letters dated March 3, 2003, UBS submitted claims under the Policies alleging that the 1999 BSC Plan and the 2001 BSC Plan are "materially incorrect in various places." In the claim letters, UBS stated, in part: "Also, we are uncertain at this point of the extent of our damages and the various claims and causes of action that may exist." Copies of the March 3, 2003 letters from UBS are attached to this complaint collectively as Exhibit "K."

23. Stewart acknowledged the claims by correspondence dated March 13, 2003, a copy of which is attached to this complaint as Exhibit "L."

### D. Stewart's Investigation

24. In response to the claims, Stewart immediately began an extensive investigation and regularly updated UBS on its progress. Stewart's investigation of UBS's claims has included, among other things, the commissioning of an entirely new survey by Gunther Engineering Inc. ("Gunther") to determine what errors, if any, existed on the 1999 BSC Plan, and the commissioning of an appraisal by Coleman & Sons Appraisal Group ("Coleman") to determine the extent of the loss, if any, covered by the Policies.

25. As a result of its engagement by Stewart and Chicago, Gunther prepared a plan dated August 12, 2003, and entitled "ALTA/ACSM Land Title Survey in Waltham, Massachusetts, Middlesex County, prepared for Chicago Title Co. and Stewart Title Co." (the "Gunther Plan") and a comparison plan depicting the property lines as shown on the 2001 BSC Plan (in red) and the property lines as shown on the Gunther Plan (in green) (referred to as the "Comparison Plan"). Copies of the Gunther Plan and the Comparison Plan are attached to this complaint as Exhibits "M" and "N," respectively.

26. Also, as a result of its engagement by Stewart, Coleman prepared two appraisal reports with regard to the diminution in value of the Property resulting from the survey discrepancies – one covering the Property owned by I-Park West Seyon (the "Seyon Appraisal") and the other covering the Property owned by I-Park Grove Willow (the "Grove Willow Appraisal" and collectively with the Seyon Appraisal as the "Coleman Appraisals"). Copies of the Grove Willow and Seyon Appraisals are attached to this complaint as Exhibits "O and P," respectively.

### E. UBS's Lack of Cooperation

27. In the context of its investigation of the claims, Stewart has repeatedly requested documents and information from UBS, including loan documents, title records, records relating to the foreclosures, and documents supporting their alleged losses. Attached hereto as Exhibit "Q" is a copy of one such request. Despite such requests, UBS has repeatedly refused to supply Stewart with information, and provided only meager documentation relating to the foreclosures. Attached hereto as Exhibit "R" is an example of such refusal. UBS' lack of cooperation has impeded Stewart's efforts to investigate the claim, caused Stewart to expend sums unnecessarily, and has resulted in prejudice to Stewart.

28. Paragraph 5 of the Conditions and Stipulations of the Policies requires that "a proof of loss or damage signed and sworn to by the insured claimant shall be furnished to the Company [Stewart] within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage."

29. Also under paragraph 5 of the Conditions and Stipulations of the Policies, Stewart had the right to request production of all records, books, ledgers, checks, correspondence and

memoranda . . . which reasonably pertain to the loss or damage." That provision further provides that "[f]ailure of the insured claimant [in this case UBS] to . . . produce other reasonably requested information . . . as required in this paragraph . . . shall terminate any liability of the Company [Stewart] under this policy as to that claim. . . ."

### F. The Alleged Loss

30. Paragraph 7 of the Conditions and Stipulations of each of the Policies provides, in part: "This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described. (a) The liability of the Company under this policy shall not exceed the least of . . . (iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

31. By a letter dated October 13, 2003, UBS, through its counsel, purported to enumerate its claimed losses. In that letter, UBS identified three distinct errors in the BSC Plans which allegedly caused losses. Those alleged errors were identified as follows:

> a. "[C]ertain portions of the Property are more narrow along the southern boundary on the east side of Seyon Street than the original survey depicted (the 'Southeast Boundary Error')
>
> b. "[C]ertain portions of the Property are also more narrow along the southerly boundary on the west side of Seyon Street (the 'Southwest Boundary Error')
>
> c. "[T]he boundary line along the west side of Seyon Street is several feet closer to the building known as West 4 (the 'Seyon Street Boundary Error') than was depicted on the original BSC survey."

A copy of this letter is annexed hereto as Exhibit "S."

32. The alleged survey error defined by UBS as the "Southeast Boundary Error"

relates to Lot C as shown on the Gunther Plan. The so-called Southwest Boundary Error and the Seyon Street Boundary Error as defined by UBS relate to Lot A as shown on the Gunther Plan.

33. The October 13, 2003 letter from UBS's counsel contains an alleged "estimate" of damages "well in excess of $4,275,046." UBS's estimate of its loss contains amounts for alleged losses such as costs to relocate "the Raytheon pump and treat system . . . , [t]he cost to demolish, redesign and reconstruct a portion of the building . . . and [t]he diminution in the fair market value of the Property caused by the reduced size of the building following the required demolition and reconstruction[.]" UBS also contended: "The Seyon Street Boundary Error has reduced or eliminated the availability of a strip of land between the building commonly known as West 4 and Seyon Street. The loss of this strip of land prevents the owner of West 4 from expanding certain entryways into that building which will adversely effect (sic) the marketability of that space for either sale or lease." Those alleged losses, even if they exist, are not compensable under the Policies as they are not insured matters and are not causally connected to the survey discrepancies.

34. In its October 13, 2003, letter from its counsel, UBS ascribes damages of $153,246 resulting from the loss of square footage identified on the Gunther Plan.

35. It is Stewart's position that neither the October 13, 2003, letter nor any other correspondence from UBS or its counsel constitutes a proper "proof of loss or damage" required under Paragraph 5 of the Conditions and Stipulations of the Policies.

36. The Coleman appraisal of the Grove Willow parcel (Lot C on the Gunther Plan) concludes that the diminution of value of Lot C resulting from the comparison of the 1999 BSC Plan with the Gunther Plan is between zero and $90,000.

37. The Coleman appraisal of the West Seyon parcel (Lots A, B & D on the Gunther Plan) concludes that the diminution of value of Lots A, B & D resulting from the comparison of the 1999 BSC Plan with the Gunther Plan is between zero and $275,000.

38. Based upon its diligent investigation of the UBS claims, including the Gunther Plan and the Coleman appraisal, Stewart determined that the maximum possible loss under the Policies was a total of $365,000.

### G. Stewart's Tender under the Policies

39. Under Paragraph 6 (b)(ii) of the Policies, Stewart had the option "to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy . . . Upon exercise by the Company [Stewart] of [this option], the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation."

40. With a letter dated November 6, 2003, Stewart tendered two checks to UBS in the total amount of $365,000. In the November 6 letter, Stewart indicated that the amount tendered represented what appeared at that time to be the insured claimants' maximum possible loss according to the appraisals. Stewart tendered the checks "without restriction" and allowed the insured claimants to negotiate them without waiver of their right to assert that additional sums may be owed under the Policies.

41. UBS negotiated the checks tendered by Stewart while reserving its rights under the Policies.

42. There is a disagreement between the parties as to the terms and conditions of

---


coverage under the Policies, including the duties and obligations of UBS in presenting and perfecting a claim under the Policies, and the types and amounts of the covered losses.

43. As a result, an actual and justiciable controversy exists between the parties as to which a declaration of this Court is sought, resolving the rights and obligations and duties of the parties and the amount of loss, if any, compensable under the Policies.

44. As the co-insurer with Chicago, Stewart is entitled know the details of any settlement between UBS and Chicago relating to the insureds' claims under the Policies.

45. The terms under which Chicago made any payment made to UBS relating to the insureds' claims under the Policies has an impact on the extent of Stewart's liability under the Policies, if any.

46. The terms under which Chicago made any payment made to UBS relating to the insureds' claims under the Policies also has an impact on the extent to which Chicago is liable to Stewart, if at all, for contribution based upon the payments and costs already paid by Stewart or for which Stewart may become liable.

**COUNT I:**
Declaratory Judgment as to the Identities
of the Insureds Under the Policies

47. Stewart repeats and incorporates the allegations contained in each and every one of the above paragraphs.

48. Stewart seeks a declaration from the Court as to the correct identities of the insureds under the Policies.

## COUNT II:
### Termination of Stewart's Obligations Under the Policies for UBS's Failure to Submit a Proper Proof of Loss

49. Stewart repeats and incorporates the allegations contained in each and every one of the above paragraphs.

50. UBS failed to submit a proper "proof of loss or damage" required under Paragraph 5 of the Conditions and Stipulations of the Policies.

51. As a result of UBS's failure to submit a proof of claim, Stewart has been prejudiced.

52. As a result of UBS's failure to provide Stewart with a proper proof of loss, Stewart is entitled to a declaration that its obligations under the Policies are terminated with respect to UBS's claims.

## COUNT III:
### Termination of Stewart's Obligations Under the Policies for UBS's Failure to Provide Documents and Information to Stewart

53. Stewart repeats and incorporates the allegations contained in each and every one of the above paragraphs.

54. UBS's failure to provide Stewart with documents and information reasonably requested is a breach of Paragraph 5 of the Conditions and Stipulations of the Policies.

55. As a result of UBS's failure to provide the requested information, Stewart is entitled to a declaration that its obligations under the Policies are terminated with respect to UBS's claims.

## COUNT IV:
### Declaratory Judgment as to the Loss or Damage
### Compensable Under the Policies

56. Stewart repeats and incorporates the allegations contained in each and every one of the above paragraphs.

57. Based upon Stewart's investigation of the claims, the loss or damage compensable under the Policies is a total amount between zero and $365,000.

58. Stewart seeks a declaration of this Court that UBS has sustained no loss or damage compensable under the Policies, or that the loss or damage is equal to or less than $365,000.

## COUNT V:
### Declaratory Judgment that Stewart Fulfilled its Obligations Under the Policies
### by its Tender of the Maximum Amount of the Loss or Damage

59. Stewart repeats and incorporates the allegations contained in each and every one of the above paragraphs.

60. By payment of the maximum possible loss or damage to UBS, Stewart fulfilled its obligations under the Policies.

61. Stewart seeks a declaration of this Court that it has fulfilled its obligations under the Policies for UBS's claims.

## COUNT VI:
### Declaratory Judgment as to the Parties' Rights
### as Affected by any Settlement Payments

62. The Coinsurance Endorsements contained in the Policies obligate Chicago to reimburse Stewart for one-half of all amounts tendered by Stewart to UBS to compensate for loss under the Policies, and one-half of Stewart's costs and expenses.

63. Stewart is entitled to an accounting from Chicago as to any payments made to UBS in settlement of any claim under the Policies.

64. Stewart seeks a declaration of the Court as to the rights and liabilities between itself and Chicago as co-insurers, and any limitation of liability to the insureds resulting from any settlement.

WHEREFORE, the Plaintiff, Stewart Title Guaranty Company requests that the Court:

1. Enter a Declaratory Judgment declaring that:

   a. UBS failed to submit a proper "proof of loss or damage" required under the Policies and that as a result Stewart's obligations under the Policies are terminated with respect to UBS's claims.

   b. UBS' failure to provide Stewart with documents and information reasonably requested is a breach of the Policies and as a result, Stewart's obligations under the Policies are terminated with respect to UBS' claims.

   c. UBS' compensable loss or injury under the Policies is limited to the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by the Policies and such loss or damage does not exceed $365,000.

   d. Stewart has fulfilled its obligations to UBS under the Policies with respect to UBS's claims.

2. Enter judgment declaring the rights of the parties under the paragraph 8 of the Conditions and Stipulations ("Limitation of Liability") of the Policies.

3. Enter an order requiring Chicago to provide an accounting to Stewart of all payments made to UBS in settlement of any claim under the Policies.

4. Enter judgment declaring the rights and liabilities between itself and Chicago as co-insurers.

5. Enter such further relief as the Court deems just.

STEWART TITLE GUARANTY COMPANY
By its attorneys,

_____
Thomas M. Looney (BBO #555040)
Richard E. Gentilli (BBO #189080)
Bartlett Hackett Feinberg P.C.
10 High Street, Suite 920
Boston, MA 02110
617-422-0200

Dated: May 3, 2004